The Honorable Judge of the United States Courts of Appeals is in the Seventh Judicial Circuit. Hear ye, hear ye, hear ye. All persons having witnesses before this Honorable Court are admonished to draw near and give their attendance as court is now sitting. Godspeed to the United States and its Honorable Court. Good afternoon everyone. Judge Hamilton, can you hear and see us okay? I can. How about, can you all see and hear me? We can, yep. Okay, we convene this afternoon for argument in Appeals No. 24-3248 and 24-3249, LSP Transmission Holdings and others v. NIPSCO and others. So I see Mr. LaRoy, are you going to begin? Good afternoon. Good afternoon, Your Honor. Kevin Leroy of Charlton Pepper on behalf of the Intervenor Defendant Appellants, Northern Indiana Public Service Company and others. This court should stay the District Court's preliminary injunction pending this appeal as we have a likelihood of success on the merits of the appeal and all equitable considerations weigh in favor of a stay. So I'd like to begin by making two main merits arguments and then I'll turn to the equities. So our submission first is that HEA 1420 did not raise any dormant commerce clause concerns because it does not discriminate against interstate commerce, which is to say it does not treat substantially similar entities differently based on whether they are in-state or out-of-state actors. But second, even if there were dormant commerce clause concerns here, Congress has approved of state right of first refusal or ROFR laws like HEA 1420, which eliminates any possible dormant commerce clause issue. So beginning with my first merits argument, so the District Court erred in concluding that HEA 1420 likely violates the dormant commerce clause and it's essential to recognize for purposes of the dormant commerce clause, only laws that discriminate against interstate commerce violate the dormant commerce clause, which means treating substantially similar entities differently based on whether they are in-state or out-of-state businesses. And that's the main principle from the U.S. Supreme Court's Tracy case. But here, HEA 1420 does not discriminate between substantially similar entities based on whether they are in-state or out-of-state. Before you launch into a lot of the doctrinal discussion here, I wonder if you all could – I'll have the same question I think we all do for all counsel, but what has happened over the past week and how does it affect the issues in front of us? What happened in front of – in the MISO board on Thursday? Certainly, Your Honor. So shortly after this court entered its administrative stay, MISO approved the Indiana projects at issue here. That's in the Tranche 2.1 project. And so our understanding is that means that those projects will continue under HEA 1420 because that had been the law of the land at the time of their decision. So they – so does that mean – I just want to pause you. They acted last Thursday? That's right. So they approved the projects. That's right. And so in our view, that opens the projects up to continue under Indiana HEA 1420. Did they take any steps that would foreclose the possibility of competitive bidding at this point? So our position – and this is also drawn from my friend on the other side's filing in opposition – they said in that opposition, based on an amicus brief that MISO had previously filed in front of the Iowa Supreme Court, that that decision, the decision to approve these under the accident law, is, in MISO's view, irrevocable. Now, we don't speak for MISO here. We speak for just our companies. However, the challenge – MISO's decision to approve these projects, and whether they are revocable or irrevocable, turns on MISO's interpretation of its tariff. Now, we agree with MISO that they should be under HEA 1420. But to the extent that any parties anywhere disagree, they can challenge MISO's understanding of its tariff in front of FERC – in fact, have to challenge it in front of FERC. Before you go further, can we just stick with what's happened? So what is the practical effect, in your view – and others can answer this too – of the approval of the projects, the tranche, whatever, projects? What happens next? So, in our view, it goes back to HEA 1420. Incumbent utilities may exercise their right of first refusal. To the extent they do, MISO should honor that, and we think that it is MISO's position and should be MISO's position. To the extent that incumbents do not exercise that, then, per MISO's tariff, they would open it up to the competitive bidding process. So there's 90 days for incumbents to do that? That's right, John. I believe that's correct. 90 days. So does anything meaningful happen in the next 90 days? So I think the meaningful thing that happens is that the incumbents have to send a notice to the IERC saying that they're going to exercise their right of first refusal. Do they also tell MISO that? Yeah. So simultaneously with issuing the notices, they would inform MISO of that. And I will say, this is the first time that we're exercising these rights under the law, so the exact procedure is essentially being defined as we're doing this now. But yeah, they would inform MISO and the IERC. I may have gotten lost in what you just presented to the court, but if your company's position is that it's business as usual because MISO acted under HEA 1420, then why do you need a stay pending appeal? So the reason we need the stay pending appeal is because if the court says, if the court dissolves the administrative stay or doesn't continue to stay forward, we think it's going to be extreme confusion on what the state of the projects are. So we think MISO should say the projects are under HEA 1420, but then that could open this up to challenges before FERC, create extreme confusion on what is the state of play here as to these projects. And I think ultimately what that means is it's going to be delaying these important projects for the state of Indiana. So here's what confuses me about where we're at right now. MISO's not a party. They're not a named defendant, obviously. And I had been under the impression, you guys all know this, but it's based upon something filed in an Iowa amicus brief or some kind of voluntary representation that MISO has made that they as an organization, it seems voluntarily, it doesn't seem to be the product of statute or anything else, but they have voluntarily agreed to respect orders, judgments, and a whole list of things. But somehow, someway, maybe they didn't know about it. I don't know. But they acted last Thursday. Do you have a perspective on why that happened or how that's consistent with the representation that they've made? Certainly. So I think your Honor's correct. It's based on MISO's position in an amicus brief. And so I think my understanding from that position is that MISO respects the law at the time it acts. At the time it acted, HEA 1420 was the law, given this Court's administration it was the enforceable law. And so they acted under that law. So our position is that that should be a governing board. But I think that we need to stay at the preliminary injunction because if you lift that, it becomes very unclear what MISO should be doing. And again, we think MISO should just go under HEA 1420, but I think that's going to be, I think it's fair to say, it would be challenged by interested parties. They're not a party, so I guess what I'm stumbling on is what difference does it make what we say or what we don't say because nothing would bind them. Well, if you say that the district court's injunction, that we're likely to succeed, so if you state it, then that is the law in Indiana. HEA 1420 would continue to be the enforceable law in Indiana. And so I think there would be no question at all that MISO needs to follow that law. But MISO's tariff says it respects state rights of person feasible. But the other problem we're trying to wrestle with here has to do with standing redressability of advisory opinions because usually we don't grant advisory opinions or issue them where somebody, the interested party says, well, we will probably follow that as a matter of our voluntary choice. That doesn't solve the problem. So I think I have two responses to that, Your Honor. First, to the extent the court may be concerned that this is an advisory opinion, I think certainly that falls on plaintiff's feet for not naming MISO in this litigation. And so that would be counsel in favor of just saying… We'll be asking plaintiffs about this too. Don't worry. Very well, Your Honor. So my only point is that I think that would go to say either you state the injunction because the district court would likely lack jurisdiction or just dismiss this case outright. The second point, though, is we do have the preliminary injunction. And the preliminary injunction is in joining enforcement of HEA 1420. That grants my client's very valuable right to first refusal. And so we're certainly injured by that. And so certainly the court should at the very least be able to give us relief, at least at state relief, pending the full resolution of the appeal. The question is whether the named defendant can redress that injury. Yeah, very well, Your Honor. And so I think, again, though, if the named defendants are not the proper defendants in this case, I think that goes to the jurisdiction over the entire case. And so you should at the very least state a further injunction pending further inquiry on the jurisdictional question or dismiss this case. So at the very least, we would certainly welcome that outcome, if not an outcome that addresses the merits. So I'm happy to turn to merits versus pending. Sorry, not quite yet. This is a pretty unusual proceeding, but we've got a lot of questions.  Mr. Leroy, I guess that is, can you tell us, and maybe we should ask the folks from the Attorney General's office, but what is the practical effect of the district court's injunction on the commissioners of the Indiana Utility Regulatory Commission? What does it tell them to do or not do that they would otherwise not do or do? Certainly, Your Honor. So my friends from the Indiana Attorney General's office will be able to correct me if I'm wrong and elucidate this more clearly. So they did raise these jurisdictional concerns, concerns of naming the improper defendant below. I think those are certainly valid arguments. They can continue to press them here. We focused on different arguments. I think what the injunction Fairley Wright would say is they cannot accept the designation, or excuse me, accept the asserted exercise of a right of first refusal. And I think the implication of that would be, and therefore the right has not been exercised, and so might so. Like they would, what, receive a piece of paper and throw it away? What do they do? They just get it, right? Yeah, so that's certainly right. So they receive the notice. I think, again, to the extent the court had concerns that this is the wrong name defendant, that the plaintiff should have named myself, then we would certainly welcome that disposition of this case. But my understanding, the theory in the preliminary injunction would be it's not a valid exercise anymore, or the exercise has been blocked of the right of first refusal from my client. So thus, it has not been exercised, and therefore might so goes through the competitive bidding process rather than recognizing a roofer. So I understand that to be the theory for why the defendants were named who they were. Okay, well, we have the Attorney General's office. It's here, correct? Yeah, that's right. Mr. Leroy, can I ask you a question about the merits? Yes, happy to, Your Honor. I follow the – there's all this debate about whether incumbency equals discrimination, and some benefits for incumbency amount to discrimination or not. One of the concerns that I have here is that I think the Supreme Court has made pretty clear that state and local laws that benefit businesses in an area smaller than a whole state can still be deemed to discriminate against interstate commerce, right? I mean, Dean Milk and the carbone garbage processing cases come to mind. So I think that's correct, Your Honor. However, I think the entire inquiry turns on whether those businesses were substantially similar between in-state and out-of-state businesses. So what distinction is the law making? And if it's drawing a distinction between businesses that are not substantially similar, then you don't have the Domerant Commerce Clause problem. So I think it really does dig into an inquiry of what is the distinction here, and is it a legitimate distinction, or is it itself a discriminatory distinction between in-state and out-of-state, or just a very close proxy for discrimination between in-state and out-of-state? So Your Honor mentioned the milk cases, there's the wine cases, and I think in all those cases what you see is the state or the locality making a law imposing a distinction that could not possibly have any reasonable, rational, legitimate reason to have that. And so what the court is saying is the reason you're making that distinction is to discriminate, to keep out-of-staters out. So you don't want milk pasteurized within two miles of the city square of Madison. You don't have any possible safety reason for that, as in the Dean's Milk case, so therefore we're saying what you're doing is discriminating against in-state and out-of-state commerce. But that's not what we have here. So HEA 420, it makes a distinction between transmission owners based on whether they have particular existing facilities in Vienna. And so an incumbent, the owner of an existing facility, has a right to – Excuse me, but doesn't a distinct differentiate on the basis of whether they have an existing facility that is connected to the particular project? Yes, that's exactly right, Your Honor. And so what it says is if you own the existing facility that will connect to an approved project from MISO, you get the right of first refusal to build, operate, maintain that project. So doesn't that necessarily mean if – I'm just making this up.  Okay, that if NIPSCO or Duke Energy, for example – NIPSCO, I understand, operates as its acronym Northern Indiana. If NIPSCO wants to move to Southern Indiana or Duke Energy wants to move into another part of the state, they do have a physical presence in the state because NIPSCO operates in Northern Indiana. But they would be considered a non-incumbent, would they not? Were they to want to do the work in Evansville or something? Yes, that's exactly correct. So an entity is an incumbent only as to those projects that connect to their existing transmission facilities. So it is a non-incumbent. That would be true, would it not, as to – what's it called? There's a couple of them. Republic is one of them. That's right, yes. So Republic is an incumbent with respect to the work that it's presently doing. Yes, yes, that's exactly correct. And so I think that's a very powerful point. Thank you for bringing it up, Your Honor. And that it shows that this is not creating a sort of closely held amount of economic actors in Indiana who are the only ones who can build this. What we're doing is we're keying this to do you own the existing facility? And if you do, you have the right of first refusal as to – But let me ask you, within this kind of narrow window we're looking at, Republic is an incumbent because during this gap period between 2011 and 2023, as an outsider could come in, bid, get the project, build the project. But under H.A. 1420, Republic couldn't do all that anymore. That's somewhat true but not exactly correct because if an entity, if an incumbent does not exercise the right of first refusal, then it opens up to competitive bidding under MISO. So Republic could come in. Someone like Republic could still come in. Yes. But only – Yes, that's exactly right. And so that does distinguish our case factually from the Fifth Circuit case. Now, we think the Fifth Circuit's reasoning was wrong, but at least factually, our statute is not the type of full-throated statute that Texas had enacted. And I think it's important to say the reason why we have these rights of first refusal, and that's if you have an incumbent who has an existing system and they're expanding out that system, that increases reliability – that increases the reliability of the system because if the system goes down, you have only one entity having to respond to that. And so my clients are vertically integrated utilities in Indiana. They're all across Indiana. They serve millions of end retail customers. So Indiana knows that they have the capability, the staff, the services, the equipment to respond quickly to emergencies, to power failures. And so Indiana ostensibly is saying we want them to have the first crack at building this system because that increases reliability for everyone. So that's the first main argument for why these entities are not substantially similar. And there's another argument in that the vertically integrated utilities, like my clients, who are incumbents, they're subject to a different mix of regulatory burdens and benefits that non-incumbents don't have. And so this is just tracking the Tracy case. So it's not discrimination to treat these two types of entities differently. So, for example, vertically integrated utilities in Indiana, they have to serve all retail customers. They have to serve them, and on a non-discriminatory basis, and they're subject to rate regulation by the IURC. And so these things sufficiently differentiate them, and it's consistent with the state's longstanding historic police powers over electric utilities and utilities more broadly. So these are distinguishing things to say it's okay to treat these folks differently than other kinds of businesses. Mr. LeRoy? Yes, Your Honor. Can I ask you whether the trans 2.1 projects are expected to follow existing rights of way or whether instead they will require use of eminent domain to condemn entirely new rights of way for new lines? And I've got some follow-up depending on how you answer that. So I don't have that answer offhand. I'll certainly confer with my colleagues and get that to you on rebuttal. My hunch is that it doesn't necessarily follow existing rights of way, but, again, I will confer. I don't want to hunch. I don't want to hunch, but I do want to raise a concern about control of the use of the power of eminent domain among FERC, MESO, and the IURC in terms of which entity or entities might have some say over the precise location of these lines and what happens to property that is owned by other people. Certainly. I will confer. And for rebuttal time, I'm happy to address that question. So I do have a second merits argument that I'd like to address. The first one, of course, is that these are not substantially similar businesses and so you don't have any dormant commerce clause concerns. If the court disagrees with that, the second argument is that Congress has approved right-of-first refusal laws like HEA 1420 in the Federal Power Act, and so that eliminates any dormant commerce clause concerns. And this is just a straight application of the doctrine that the commerce clause provides a power to Congress, so if there is a dormant commerce clause concern, Congress can eliminate that concern by exercising its power. And here we think that Congress has done that in the Federal Power Act. And, indeed, the court has already held this in the MISO case where it said that the Federal Power Act preserves the traditional role of the states to regulate the siting and construction of transmission facilities, that the states retain authority over the location and construction of electrical transmission lines. And that is unlike the regulation of natural gas, which is a field in which FERC has jurisdiction over the siting of interstate lines. And so we think that right-of-first refusal is just an exercise of this, and the court essentially recognized that in our submission in affirming that MISO is allowed to recognize these in its tariff. And what is the statutory language you're relying upon for that? So it's Section 824.b.1. That's preserve the state's authority. In the language it says over interstate transmission of electricity, and this court in the Supreme Court has interpreted that as a broader principle that states retain the longstanding authority over siting. Even for interstate lines? That's correct. So as lines going through the state, that even though they're transmitting electricity interstate, the siting authority still applies to cover that. Okay. Do you want to save the rest of your time? Thank you. I'm sorry. With my colleague's indulgence, sorry, Mr. Leroy. The district judge said no bond would be required for this preliminary injunction because money damages were not being sought. I confess I didn't quite understand that reasoning, but I wonder if you and the other private parties might express a view here about whether a bond should be required either for the original preliminary injunction or for a state pending appeal. Because the financial stakes here seem pretty substantial. That's correct. So the financial stakes are indeed substantial. So our understanding is that because of who they named, there shouldn't be a bond because of who the named defendants are from the state. Why is that? The idea of not being able to obtain the money from behalf of the state from that? Well, the preliminary injunction, if we had left it in place, might well inflict financial losses on your clients. That's correct, Your Honor. And vice versa if we extend our administrative state. So I think that's correct, Your Honor. So we haven't developed an argument on trying to hold plaintiffs to the obligation to present the bond. Candidly, this is litigation that we're obviously doing in an emergency posture, but I'm happy to supplement to the extent the court would desire. Well, nobody's been asking for a bond yet. So okay. Very well. If I could reserve for rebuttal.  Okay. Ms. Lawrence. May it please the court. Jenna Lawrence for IURC. I heard a couple questions here about what is actually happening on the ground, and I hope I can answer some of those for you with what's actually happening at IURC. First of all, we concur with all of the arguments raised by interveners and agree that this court should grant a stay. But the fundamental question of what did the injunction actually do is actually a very serious one that we raised with the district court, because we believe the district court didn't have jurisdiction. That's because the injunction enjoins IURC from enforcing the right of first refusal in HEA 1420. And as Your Honors have pointed out, it's not quite clear what that means. All IURC does under the statute is receive a notice that says we are exercising our right of first refusal. And from this most recent tranche of projects, IURC has already received several right of first refusal notices. But it's not clear what enforcement of that would do because the statute nor the process, there's no place, nothing else happens. IURC doesn't transmit that information to anyone else. It's helpful maybe to understand why that notification requirement was put into the law. And the reason is that IURC needs to know who is operating transmission facilities in MDM if, say, there's a problem with one of them or they need to be able to reach out to that person. So that is a serious question that the justiciability and whether the district court even had jurisdiction to enter this injunction in the first place. But one of the things that our intervener friends pointed out is that this creates confusion. And we talked a little bit about the Iowa amicus brief from MISO, and I'd like to talk about that a little bit more and why that is so different from this case and why this court shouldn't rely on MISO's representations in another state case about what it would do here. And here's why. In the Iowa case, the Iowa Supreme Court had issued a final judgment that said that Iowa's right of first refusal statute violated an Iowa state constitutional provision about the naming and subject matter of statute. A totally different issue. But there, there was a final judgment from a state court saying that Iowa's law was unconstitutional under Iowa's constitution. That's not what's happened here. We have a preliminary injunction that says that the plaintiffs are likely to succeed on the merits and then enjoins IORC from enforcing the law, a role that IORC doesn't even actually have. Well, you have, okay, you're touching on a lot of different issues here, which we're thankful for. So the Indiana statute does give the commission the authority, at least generally, does it not, to enforce laws relating to public utilities? Correct. Indiana law gives IORC a general enforcement power, a catch-all provision. So that's normally used for, hey, your transmission facility is sparking and starting fires. We're going to come and say you need to stop doing that. Could the commission invoke that authority to do anything vis-a-vis ISO or MISO with an award of a new project? Our understanding is that no, they could not. Because IORC has no enforcement authority over MISO. Literally none? It can't go and tell MISO how to award the projects that MISO is awarding under its tariff. Perhaps it could go before FERC and challenge it there, but that's not necessarily clear either. So if MISO had declined altogether to abide by HEA 1420, even on Thursday, even though it seems like it wasn't necessary for it to make that kind of call, there's nothing that IORC would do? That's our understanding, that IORC doesn't have any enforcement authority to actually do anything about that. Which goes to the stay factors and why the equities really counsel having it stay here. Because we don't know why MISO is acting, because they're not here. I can't tell you why they're not here. If I made up a just absolutely crazy hypothetical, that MISO decided to not award an incumbent a contract because of the race, gender, ethnicity, religion, et cetera, of the power company's CEO, the commission could do nothing about that? This goes back to they might be able to go before FERC and ask FERC to enforce MISO's tariff, but that would be FERC doing the enforcement action, not IORC. IORC would be coming as a litigant in that situation. They wouldn't be coming as an enforcer. And of course, going back to why a stay is recommended or not, if the plaintiffs are wrong on the merits, then a stay should issue because they shouldn't have received the preliminary injunction in the first place. Thank you. Okay. Ms. Murphy, good afternoon. Good afternoon. Erin Murphy on behalf of the plaintiffs. I'd like to start by talking a bit about what we understand happened last week because I think it's a little different from what you've heard from  MISO's board did indeed approve these projects in the sense of these projects are going to be built. But what it didn't do is assign them to anybody. And that's a critical distinction because in the Iowa amicus brief that we submitted, this is an exhibit to our reply brief below in support of our PI brief, the position that MISO took is once it's assigned a project to an incumbent, it believes that it's bound by its tariff to stand by that assignment, even if the law changes. But MISO didn't do that on Thursday. It put out an, as you can still look at the press release that they cite, all it said is we've approved these projects. And if you look at all of the materials they put out, they said within 30 days, we will put out further notice that tells you which projects are going out for competition. So while they did approve the projects, we agree on that much. They didn't take that critical step of deciding which projects will go out for competition versus being, being assigned to an incumbent. And I think, I mean, we don't know this for certain, but they were well aware of these proceedings. Everybody told them what was going on. They knew that this court was trying to act expeditiously. So our understanding is that they, in deference to this court, did not try to move to the proceedings that were ongoing here, given that this court had indicated that it would be ruling quite promptly on this. So you don't agree. It's business as usual as far as MISO. Absolutely. We're about to proceed as if HEA 1420 were still in place. Do we have documents available to us that reflect these nuances? So the best thing, I mean, we haven't submitted this, but we'd be happy to do so. In addition to putting out the press release that they cite, there were like exhibits that they put out about kind of the different projects that were dealt with on Thursday, some of which are these trans 2.1 projects. And then there's other projects they dealt with that nobody's arguing are subject to competition. And on those ones, they did indicate who's going to construct those, but they didn't indicate that as to the trans 2.1 project. And they didn't say anything at the meeting about awarding them to them. So, you know, so it's our understanding. There's nothing indicating, certainly nothing been submitted by the intervenors here that is supports the notion that MISO has made that assignment at this point. So I don't think this court has a basis to believe at this point that this is moot. I think the right thing to do is decide it and let MISO figure out for itself what it thinks, you know, when it is making the appropriate determination. Yeah. And the point you're making is that they, I mean, I'm reading into this a little bit, but that they took a step that they thought they could take, which was project approval generally. But project approval is distinct from awarding any contract under an incumbency or non-incumbency status.  And pursuant to their documents, they say the notice about which projects go out for competition won't come until 30 days after the meeting. And again, we haven't had a chance because we didn't know what additional briefing this court wanted before today to submit, but we'd be happy to, you know, provide some additional information upon that. But that notice that comes out and tells you which of these tranche one tranche 2.1 projects are going to be put out for competition has not happened yet. And neither has anything saying that they've been assigned to any incumbents. And that's across, to be clear, all the tranche 2.1 projects, not just the ones that are affected by MISO. In other words, it's not out of deference to this litigation. This is their normal way of operating. It's a little unclear to, I, I wasn't able to completely run down whether that's how they always do it, or they did delay it a little bit here because of what was going on. But one way or another, they didn't in the notices that they put out from that meeting. And at the meeting, I gather they, you know, acknowledged that they knew this litigation was going on, but said nothing really more beyond that. When does this all it's within this next 90 day period that all this goes down. So in 30 days from the December 12th meeting that they will put out the notice about competition. Now, of course, there's 90 days under the statute to, to, to exercise the right. I think nobody really thinks any incumbents not going to exercise the right, but theoretically, if an incumbent within, you know, after the 30 days that they weren't going to exercise, then the question would go back to MISO to say, Oh, well, something that we didn't, you know, this is under the assumption that this law were in place, which of course, we don't think it should be, but if it were in place and MISO said, well, you know, we would have put this project out for competition, but we can't because of the law. And then someone didn't exercise their right. Then MISO would, you know, hypothetically. Well, we're still on some of these preliminaries. Can you, would you mind, I don't want to throw you off your points here, but would you mind responding to Ms. Lawrence? She, these are my words, not hers, but basically the wrong parties for us here. Yeah, absolutely not. So MISO itself does not just do this, like out of the goodness of its heart. It is a tariff that says what it has to do. And as MISO understands its tariff, it is bound, its tariff has the force of federal law. It's bound by its tariff to do what its tariff says. And its tariff pursuant to this court's decision upholding the tariff in MISO, the tricep MISO transmission owners case says that it has to follow duly enacted state right of first refusal laws that are enforced when it's taking the relevant action. So it's not as if MISO is kind of just, you know, maybe today we'll follow a law and maybe tomorrow we won't. They as a matter of federal law under their tariff are required to follow what the state law is. Yeah, that point I get. But suppose, for example, they do or they don't, or they may fully not or something. I think the point that Ms. Lawrence was making is how does that have anything to do with the commission? Sure. And we'll say, I mean, the point that she was making actually completely destroys the argument you heard today that we're operating in an area of exclusive and traditional state jurisdiction. Because the reason the IURC can't completely go and force against MISO is because it doesn't, Indiana doesn't have the authority to decide who's going to construct an interstate transmission line that is decided under the MISO tariff that is approved by FERC. And so Indiana can put a law in place that will have the effect by virtue of the tariff of binding MISO. But Indiana doesn't have this authority. If it did, it would go after MISO instead of just enacting a law that it knows MISO as a matter of its tariff is bound to follow. Now they say we should do MISO, but we already did bring that litigation. That's what the MISO transmission owners litigation. So that litigation was about two things. But what relief could this defendant give you? Sure. If this law, so the question is whether granting the relief we've sought against this defendant will remedy our injury. And it will because if this defendant can't enforce that law, the state law, then MISO will not follow the state law. That's what MISO said in the Iowa litigation in its amicus brief. The problem I have then Ms. Murphy is that that sounds like MISO is saying, we'd like your advice about this question and we'll probably follow it. I don't think that's actually a fair understanding of what MISO's position has been. MISO has said very clearly in the Iowa litigation that it believes it is bound as a matter of federal law under its tariff to follow the orders and decrees of a court determining whether a state right of first refusal law is constitutional. And that case litigation in Iowa, just like the litigation in Texas and just like the litigation in Minnesota, the RTO or ISO was never the defendant in any of those cases. All of those cases were brought against the state commission, whatever, they all have different names in the various cases, but they were all brought against the state that has authority generally as to the ROFR law, even though the actual entity that's enforcing the right of first refusal is always the RTO or the ISO that is responsible for actually assigning a project in the context of an interstate transmission line. If I understand your case correctly, the real relief you want is an injunction that would require the competitive bidding of these projects. I don't, we want an injunction that ultimately has that practical effect, but we don't need the injunction to require the competitive bidding because if the injunction, the injunction itself says that the state can't enforce this law because this ISO will not follow this law when MISO decides to award. That's clear, that's MISO's position. They've made that position clear in other litigation and clearly interveners understand that that's their position or else they wouldn't have rushed to this court seeking emergency relief before MISO. Has anybody asked MISO? Not in the context of this litigation, but that's partly because I mean they've gone on record in the Iowa litigation dealing with the precise question of what they think their obligations are under their tariff and what they said is if a state court or a federal court, any court has enjoined one of these state laws, then we will not follow it on a going forward basis because we understand our tariff to mean we have to follow the state law that's in effect at the time that we make an assignment of the project. There hasn't been assignment yet here, but MISO believes itself to be bound as a matter of federal law to follow state law if state law is enforced. I don't think there's anything that unusual about the fact that what we've done is try to get rid of the state law. I mean you can think of plenty of context. Could you have joined MISO as a party? We could have joined them as a party, but I can tell you what would have happened. They would have come in and said we have no interest in the question of whether Indiana's law is constitutional, and we would of course have to immediately notify Indiana's Attorney General that we were challenging the constitutionality of Indiana's law. MISO would have become a side player who said nothing more than what they did in our tariff. We're bound to follow the law if it's enforced and not follow it if it's not, and we would have been right where we are, which is litigating against the state, who is the only party that really has an interest in whether this, I mean obviously the interveners do too, but the state is the principal party that has an interest in this. So even if you go look at MISO's papers in Iowa, it took no position on the constitutionality of Iowa's law. The only reason it filed in that case is because there was an order from the legislature to re-put them out for competition, and they said we don't think you can do that to us because we are not regulated by states, we're regulated by FERC. And that really goes to, I mean I'm happy to keep talking about threshold issues, but that really does go to the problem with their merits argument, which is we are not operating in an area of traditional state authority. If you will look at A24B1 of the Federal Power Act, it assigns interstate transmission lines. That is assigned to FERC, not to the states. And this law, by its terms, the only thing it applies to is lines that are part of the interstate grid. It is specifically singles out lines that are awarded through a regional transmission organization's planning process. The only lines through which that happens are lines that are part of the interstate grid. Now to be sure, FERC has not preempted the power of states completely oversighting and construction of transmission lines even in an interstate context. But to answer the question Judge Hamilton was raising earlier, it is not Indiana, IURC, it is MISO that decides what the transmission needs on MISO's grid are, that decides where you're going to have additional lines. The state does come in and play a role in requiring everybody, whether it's intervenors or the LSP affiliate, Republic Transmission, anyone who builds transmission in Indiana has to be certified as an Indiana public utility. It has to comply with all the requirements of state law about safety, reliability. We have to comply with all the same things as intervenors if we're going to construct a line. But at the end of the day, the ultimate regulatory authority in this context is FERC via MISO's tariff and FERC's regulation of MISO and the interstate grid, not the state. So I think that's a real problem for them in trying to invoke these arguments about Tracy. Tracy was a case that dealt with state retail regulation. And the Natural Gas Act, like the Federal Power Act, does give states exclusive jurisdiction over retail regulation. It does not give it over interstate transmission lines. It does the opposite and explicitly gives that to FERC. And the other thing I would note in response to their arguments about this idea that Congress has somehow empowered all of this, the Supreme Court has actually explicitly twice rejected the argument that Section 824B1 that they're relying on from the Federal Power Act authorizes states to enact laws that would otherwise violate the Dormant Commerce Clause. We didn't have a chance to put these cases in our response because we had about seven hours to file it. But I point you to Wyoming versus Oklahoma, 502 U.S. 437. That's a 1992 case dealing with state retail regulation and New England Power Company versus New Hampshire, which is 455 U.S. 331. That's a 1982 case dealing with the language in that provision talking about hydropower. In both of those cases, you got the exact same argument that was made here. The state said, by virtue of having reserved to states the authority over retail regulation, over hydropower, I think it's like the exportation of hydropower, Congress implicitly empowered states to enact laws that violate the Dormant Commerce Clause. And the Supreme Court twice said, no, we require an explicit, clear statement from Congress if that's what they're trying to do. And all Congress was trying to do here was, as it used the specific word, was reserve authority that had preexisted the Federal Power Act in the state context, not empower states to do things that they otherwise would not be able to do. Now, the Tracy decision does deal with, it gets a little closer to suggesting that there may be some areas where the states within the retail context can do things that otherwise might raise Dormant Commerce Clause concerns. But what's critically different about this case versus the Tracy case is the Tracy case was a regulation of retail, the retail distribution of natural gas by local distributors. And the court said over and over and over again, what makes this case different and makes us concerned about interfering is that the Natural Gas Act gives retail regulation exclusively to the states. And so we are concerned when we start interfering with how they regulate vertically integrated utilities in the specific context of local distribution. But as the Fifth Circuit put it in the Lake case, here we are at the opposite end of the federal-state spectrum because this law operates only in a marketplace, the marketplace for constructing interstate transmission lines that the Federal Power Act grants to FERC, not to the states. So you have a real problem with this idea that you can draw from a case that's dealing with a traditional area of state regulatory authority some sort of power for states to engage not only in direct regulation in a context that is reserved to the federal government, but to advance laws that would otherwise violate the Dormant Commerce Clause. How do you respond? This is kind of on the merits. With respect to the Republic arm of LSP that has a presence within Indiana, where it's operating vis-à-vis its services, it would have incumbency status, would it not? We think so. I mean, I think there may be a little bit of a dispute about whether you have to own a substation versus a line to qualify as an incumbent, and we don't have any substations. We just have lines. But it could qualify as an incumbent. But the Supreme Court has said very clearly that it doesn't matter if a law is also – I mean, it said both – it doesn't matter if it's benefiting and it also doesn't matter if it's boxing out other in-state interests. What matters is whether it's boxing out out-of-state interests. What case most clearly says that in your view? They said that in Dean-Milk in footnote 4, where they said it's immaterial that Wisconsin milk from outside the Madison area is subjected to the same prescription as that moving in interstate commerce. They said it in the Fort Grecio case, and then the Carbone case said the ordinance is no less discriminatory because in-state or in-town processors are also covered by the prohibition. So the court specifically and repeatedly has said even if a law has the effect of discriminating against both in-state and – you know, some in-state and out-of-state, it's still subject to that strict scrutiny. And that makes sense if you think about it because, you know, if you're a state and you actually want to attack an act of protectionist measure, you're going to accomplish that just as well by saying everyone in the state can compete or by saying, you know, only some people in the state compete. Either way, you're boxing out out-of-state interests. Now, all that means is not to suggest strict scrutiny is a low bar, but it doesn't mean – it's not a rule of per se invalidity. It's virtual per se invalidity. You go on to strict scrutiny. And if you had a context where a state can really make a viable argument that it has reasons it can't accomplish what it's trying to accomplish through nondiscriminatory measures, then you're going to survive. The problem is the state cannot make that argument here. It's defeated by the law itself since, as you just heard from interveners and the state, this law doesn't say that you have to construct a line by an incumbent. And it doesn't say, you know, this is so important. These safety and reliability concerns are so high that we're going to make this an obligation in the sense that you might do if you were truly dealing with something in the context of a captive market where, you know, you have to deal with something because there is no competition at all. This law says we're just going to give you a first shot at it. And if you, the incumbent, decide that you don't want to construct a line, then we're perfectly happy for the republic transmissions of the world to come in and do it in your state. And I don't really see how a state can say we're perfectly happy to have the competition as long as the incumbent chooses not to exercise the right of first refusal, yet still claim that it has to have this law because it's so essential to safety and reliability to box out everybody but the incumbent. Let me ask you, before 2011, in order of 1,000, were states exercising rights of first refusal? I know there was a federal scheme before that. I'm just trying to figure out why is it it's in 2023 we're seeing HEA 1420. Are these new types of laws? Does that explain the dearth of case law on this issue? What was happening before? Sure. So the way, so what order 1,000 is, it opens some but not, there's many types of transmission products that are not open to competition, even in the MISO, the RTO, ISO context. It opens certain ones up to competition. And principally what they are is parts of the interstate grid that are so essential to the whole grid that the costs are not allocated just locally to the local customers. They're allocated across all the states in the region. So basically what FERC said is, look, if you're constructing lines that MISO needs for the whole grid and therefore Illinois and Wisconsin and other states are going to have to pay for them too, then we're not going to let you have rights of first refusal. Your incumbents can compete for those lines, and they can tout all the benefits of their incumbency in the competition, but we're going to have competition on those regionally cost allocated lines. Before that, there had been these, those had, by virtue of the tariff, not been open to competition. And the other laws, the other types of projects that are really truly local projects typically wouldn't have been open for competition. So you kind of didn't like have any question about whether you needed these state laws because the tariffs didn't allow the competition in the first place. So once FERC ordered everybody to get the, to take the provisions out of their tariffs, some states started saying, I mean, basically what happened is, as interveners are quite candid about this in their papers below, that folks like them started lobbying state legislatures to create state rights of first refusal for them to put back into state law the same rights that they had lost by virtue of the proceedings before FERC. And so these laws started to pop up kind of shortly after the Order 1000 proceedings, and this one is quite clearly, I mean, again, their own affidavits below say, like, this was open to competition, so we weren't going to get the project, so instead of competing, we sought a legislative solution. That is in NIFA's own affidavit in the district court in this case. They said we lobbied for a legislative solution that would eliminate the competition that we would otherwise face on these projects. And so these laws are directly a result. There's about, you know, maybe around a dozen of them at this point. A couple of those have been held unconstitutional. A significant chunk of them are in the Eighth Circuit, which is the one circuit that has said they are constitutional. So, you know, there's still a minority approach in the country, but they kind of cropped up because Order 1000 created this question and because FERC allowed RTOs and ISOs to stay in their tariffs that they would follow these state laws if they were in existence. But I do want to be very clear that when FERC said that back in the day, FERC did not take any position on whether these laws are constitutional. It just said, you know, as a matter of kind of deference, we're going to take state law as we find it, and if you look at the final rehearing order, which is cited in our briefing below, the commissioner back then, Commissioner Bay of FERC, specifically wrote separately to say, they wanted to be very clear that FERC is not taking a position on the constitutionality of these state laws. We are not the right body to decide whether these laws are constitutional, and we understand that those questions are going to be raised in different forums like this one. So I think that makes it a little rich for everyone to come along now and say that we're somehow foreclosed by those earlier proceedings that were dealing with Order 1000, the MISO transmission owners case, that that would somehow foreclose us from now raising dormant commerce clause challenges that just weren't on the table back in that litigation at all. I mean, this law didn't even exist. Almost none of these laws existed at that time. Ms. Murphy, the concern you're touching, though, on something that gets, I guess, to my biggest concerns on the merits here. Back up. The big picture here is that these federal-state jurisdictional boundaries for electricity have been debated, legislated, regulated, litigated now for just about a century. And the federal government has obviously chosen not to exercise its full commerce power in this context but leaves considerable room for states to legislate and regulate. And given FERC's decision not to outlaw state law rights of first reviews, which they could have done, and given their approval of the MISO and I assume other tariffs as well that tolerate these state rights of first refusal, I guess I'm having trouble understanding why we should be the ones to rush in, given what seems like the expert regulator's decision to tolerate these. Well, I think the problem is that FERC did not, and we would submit could not, say that these laws can be followed even if they are unconstitutional. FERC didn't say that because I don't think FERC has the authority to say that. Congress, you know, whether Congress could even delegate to an agency the power to eliminate government commerce clause restrictions, certainly it would have to do so just as clearly as it would have to do that if it were doing it itself in a statute. And there is just nothing in the Federal Power Act that indicates that Congress meant to delegate to FERC the power to tell states that they can enact and enforce laws that otherwise would violate the government commerce clause. So I think you should take Commissioner Baye at his word when he said that FERC was not trying to inject itself into the debate about whether these laws were constitutional. In fact, it was trying to do the opposite by saying, look, we're going to say follow state law if state law is there and it is enforceable and legitimate. If it's not, then don't follow it. But that's the rule that we're going to allow our RTOs and ISOs to put in their tariff. And so I do think it's actually deferential. It's a separate opinion, though. I'm sorry? It's a separate opinion for one commissioner. That's right, but you will find nothing in FERC's orders purporting to address the question of whether these laws are constitutional. And it doesn't even say that these laws are like a good idea or, I mean, as we argued back in the MISO transmission on this case, I have a really hard time understanding how FERC can say these rights of first refusal are really problematic in a tariff since they produce unjust and unreasonable rates, but then have a turnaround and leave them in place in state law. And I think the best understanding is FERC was not trying to say, you know, these are great policy. It had just said the opposite in all of its orders leading up to the rehearing order. It was just saying we're not going to get in the way of the debate about whether state law is constitutional, and so we're going to take state law as we find it and leave that debate to be resolved in federal and state courts. And what do we do with the fact, as I understand it, maybe people who know this better can update me, but as I understand it, FERC now, for the last couple of years, has been actively considering reinstating federal rights of first refusal because the projected benefits of that have been more elusive than they expected back in 2011. Well, I think FERC has been asked to do that. FERC has not yet done that. That is the position of the other side here. We are struggling with that. FERC says, as far as I know, as of last summer, it was actively considering doing that. It's actively considering a request to do that. It has not taken any action on that at this point. We have conversely resisted that, and we've urged FERC that it shouldn't allow any of this. So I think the right thing for this court to do is take kind of FERC law as it is right now and as it is right now, FERC has said rights of first refusal should not be in tariffs because they produce unjust and unreasonable rates. But it has said we will defer to the existence of state laws in this context to the extent they are on the books upheld as constitutional by state and federal court. And I think we leave for the next round of litigation the question of whatever it is FERC ends up saying about whether it should allow these rights of first refusal in its tariffs. Am I right that all we have in front of us right now is the facial aspect of this, correct? That's what the district court ruled on below, and we're very happy for this court to focus on the facial aspect because this is a law that by its terms, it defines an incumbent as someone who has transmission in whole or in part in Indiana. So by the literal terms of the law, you can't get the preference if you're not operating in Indiana. And the Supreme Court has said repeatedly that laws that discriminate based on the extent of in-state presence trigger that strict scrutiny rule under the Dormant Commerce Clause. Now, to be sure, they've arisen in different contexts. I have a Lewis case with principal place of business. The Granholm case was do you have operations in the state? The Tennessee Wine case was are you a resident in the state? But the through line in all of those cases is the principle that the court stated in Lewis, which is that discrimination based on the extent of local operations is itself enough to establish the kind of local protectionism that the Dormant Commerce Clause is concerned with. So there's just no principle basis for saying we're going to carve out laws that by their terms say only incumbents who already operate here can get a preference. Yeah, and there's one more step to it, which I think we've covered, and that is operate in a certain way there because Republic may well be an incumbent. That's right, and I actually think that undermines the argument the other side is making about this notion that this is a law that's all about providing special preferences to vertically integrated public utilities. Republic is not a vertically integrated public utility, and nothing in this state roper law confines the rights that it provides to entities that are vertically integrated public utilities that serve retail customers. It applies to any entity that owns transmission in Holer and Pardon, Indiana, regardless of whether that entity is a vertically integrated utility like Intervenors or is an independent transmission only public utility. The incumbent's right, as I understand it, attaches if you want to connect to that which exists.  Or you want to upgrade or modify that which exists. Correct, but all you have to be is someone who owns that which exists, and you do not have to be a vertically integrated utility to own that which exists in Indiana. You have to be a public utility, which Republic Transmission is. They'd have to follow all of Indiana's public utility laws, but it doesn't serve a retail captive customer basis with actually distributing electricity. So this law, by its terms, is not a law that provides a preference only to vertically integrated utilities. It's a law that, by its terms, provides a preference to entities that already operate in Indiana, that already own or maintain transmission facilities in Indiana. Now, that doesn't mean they can't make other arguments at the back end under strict scrutiny about why they think this is necessary and why, in this context, they think it's important. We don't think any of those arguments prevail, but more importantly, I don't think any of them are relevant for purposes of the threshold question of whether there's discrimination. I see a lot of times there are... Well, do you have something else you want to say or something else I want to ask? I wanted to address something that you had raised earlier, but if you want to ask me something else first, that's fine too. There's just one other thing I wanted to make sure to address. Go ahead. Go first, and then I'll follow up. So there were some questions earlier about kind of how this injunction operates on the IURC and what its role is with respect to this law, and I don't think it's correct to say that the only role that the IURC has is just kind of accepting a piece of paper. There's a reason you file that with them. It triggers the obligation then that you have to file additional information with them. You have to comply with certain requirements, including putting certain things out for competition in the course of constructing the project. So you're notifying the IURC that you plan to construct the project so that they can then regulate you in the construction of it. And the other thing that no one's ever responded to that we've said repeatedly in this case is the obvious entity that would resolve disputes over who is the incumbent that gets to construct the project is the IURC. That's not a question for MISO. That's a question of state law, and you clearly couldn't have disputes here. I think we probably have a dispute already about this question of do you have to own a substation versus own the line. So this entity as the state regulatory authority that is charged with enforcing all of the regulatory laws for public utilities, including this one in particular, and is given specific roles that we laid all of this out in our reply brief supporting our PI below, with respect to this ROFR law, I mean, this is the only entity that enforces this. So what they're really arguing is not, you know, you kind of got the wrong entity. They're basically saying there's nobody we should be able to sue and they should get to violate the Dormant Commerce Clause with impunity, which we don't think is something supported by any of this Court's cases or the Supreme Court cases. If I could follow up with my colleague's indulgence on a couple of matters, could you address this question of who would regulate the exercise of powers of eminent domain to create new rights of way for these projects? Sure, sure. So as I understand it, so MISO determines kind of where the projects will be and what you're going to need, but they work, you know, the state has a role in that. And when a public transmission or another entity becomes a public utility that's certified in Indiana, that gives them then the power to exercise eminent domain with respect to approved projects. So it's kind of a little bit of both. MISO's kind of deciding where the route's going to be, but the state, by its ability to regulate the entities that are constructing them by requiring them to be certified public utilities and comply with Indiana laws and get approvals from Indiana, you're going to have kind of a little bit of both entities involved in the context of determining exactly where the routes are going to be and how the powers of eminent domain are going to be exercised. And then if I could circle back to one other thing that you raised with us earlier. You said there are construction projects, as I understand it, that are approved by MISO that are not subject to any competitive bidding. Yes. Right? Yes, that's correct. And what are those? Yeah, so there's certain projects, typically they're going to be more local projects. If you go back even to the proceedings, the D.C. Circuit had a decision in things called F.C. Power Company, a power that was one of the many decisions that upheld Order 1000, and they kind of laid some of this out in there. But basically you have certain projects that are kind of completely within your local zone that would be allocated where their cost would be paid for by local customers. You have certain projects that are classified as reliability projects where you have an immediate need. These are long-term projects that are not going to come online for something like five, six, seven, eight years that are designed in the long term to improve the grid for everybody. If you have a true reliability need, like the kind of things they're trying to talk about in their briefing here, where you need something to kind of happen really quickly, those get classified differently as a reliability project and they don't go out for competition. But those in essence are kind of rights of first refusal, right? They just don't even go out for any competition at all. So this actually came up in the MISO transmission owner's litigation, if you want to look back at the court's opinion back in that case, because we had challenged where MISO drew the line. LSP was one of the parties challenging aspects of that. And we challenged where MISO drew the line about which projects it would put out for competition, and we said it should have been a little more. So that decision actually kind of lays out what was and was not put out, what MISO decided would and would not be put out for competition. But the key thing to me is that the kind of true reliability projects that are not what we're talking about here, long-term things that are going to have their costs allocated across a dozen states, if you come in and you say, look, we've got a real need, that's not going out for competition in the first place. So you don't need to worry that granting, that upholding the preliminary injunction here would get in the way of any of those types of projects because they're just not going to be subject to competition under MISO's care anyway. Thank you. Anything else? Thank you very much. Thank you, Ms. Murphy. Mr. Leroy. Thank you, and may it please the Court. So Judge Hamilton, you had asked about eminent domain. I agree with Ms. Murphy on who would exercise eminent domain power. I'd only add some of the TRANF 2.1 projects are what we call greenfield projects, meaning there's no existing lines. So we would expect exercise of eminent domain authority, at least in those projects. That was my first point. I have three other points to make in rebuttal. The equities here, I think it's important to note, they certainly favor a stay, and that's to avoid confusion so we know what law will be governing these projects going forward. So MISO has approved these projects, which means, in our view, they're open under HEA 1420 for an exercise of right of first refusal. We have 90 days to exercise. Some of our clients have indicated to the IERC that we do exercise them. And so for these projects at least, the stay should stay in place so that they can go forward, these important projects. The return to the state's citing authority. So the Federal Power Act doesn't give FERC the citing authority, so the states retain that authority. That's a critical feature of the Federal Power Act. It retains the authority to the states. And I point the court to the Illinois Commerce Commission case from this court that talks about that. And then I'd like to make one additional point. So my friend said that as a matter of federal law, MISO has to follow its tariff. But in this court's MISO transmission orders case, this court approved MISO's tariff, including it honoring a state right of first refusal laws. So that reflects Congress's approval of these laws, notwithstanding whatever dormant commerce clause. Congress's? That's right. So Congress makes FERC, and so Congress is authorizing FERC to approve these kind of laws. And so I'd commend the amicus brief from the Utilities Association that goes to this in further detail. So whatever dormant commerce clause concerns the court may have, those are eliminated by Congress's approval of these kinds of laws. And so unless, Your Honor, there's any further questions, I'm happy to rest there. Any further thoughts on what it is that MISO actually did last Thursday? Just what it said in the opening, Your Honor, that they approved the projects. We think that means they approved them subject to HEA 1420. So we can't exercise and have exercised a right of first refusal, and we urge the court to keep the stay of the injunction in place so that those projects can go forward without the sort of confusion that would be in place with an active injunction. Can I ask you, and if I'm putting you on the spot and you want to defer to Ms. Lawrence, she's welcome to take the podium on this. One of the points Ms. Murphy's making is dormant commerce clause, that jurisprudence is real. There has to be a defendant. Who better to sue than the state commission that has responsibility for the overall statute? Right now we're talking about this in the context of an appeal from a preliminary injunction. But the initial complaint, unless I'm mistaken, sees both declaratory and injunctive relief. And so if 1420, at least as to the right of first refusal, is declared unconstitutional, it's void, is it not? It has no legal effect. So it certainly couldn't be enforced in that circumstance. I'm happy to defer to my friends in the attorney general's office. We didn't make the argument that they can't enforce it. Our position, though, is that certainly on the merits, we're entitled to a stay. Nobody can enforce it in that, right? Nobody could. Yes, that's right. That's right. So it would be unenforceable in that context. But our position, though, of course, is that the injunction itself, unlawful. The court should stay it and then subject to our appeal. Lawrence, anything you want to say? You don't have to. I just want to give you, I mean, the question's more directed at your client. Come up here so Judge Hamilton can hear you. I point the court to the filing that we submitted yesterday, which discusses what that would look like and how this is particularly troubling in the preliminary injunction posture versus having a final judgment on the merits about the state law. Thank you. Okay. Thanks to all parties for the preparation that went into today. We know this happened on a very expedited basis. We appreciate it very much. The court will take all of this under advisement, and you'll hear from us. And with that, we're adjourned. Thank you.